*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

RICKY L. PITTMAN,

         *Plaintiff-Appellee,*

    *v.*

CUYAHOGA COUNTY DEPARTMENT OF
CHILDREN AND FAMILY SERVICES,

         *Defendant,*

CYNTHIA HURRY, a.k.a. Cynthia Keller,

         *Defendant-Appellant.*

No. 09-4161

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-00541—Ann Aldrich, District Judge.

Argued:  January 13, 2011

Decided and Filed:  May 20, 2011

Before:  KENNEDY, CLAY, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

_____

**ARGUED:**  Steven W. Ritz, CUYAHOGA COUNTY PROSECUTOR'S OFFICE,
Cleveland, Ohio, for Appellant.  Kenneth D. Myers, Cleveland, Ohio, for Appellee.
**ON BRIEF:**  Steven W. Ritz, CUYAHOGA COUNTY PROSECUTOR'S OFFICE,
Cleveland, Ohio, for Appellant.  Kenneth D. Myers, Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

    CORNELIA G. KENNEDY, Circuit Judge.  Defendant-Appellant Cynthia Hurry
née Keller appeals the district court's order denying her summary judgment on Plaintiff-
Appellee Ricky Pittman's claims under 42 U.S.C. § 1983.  Hurry, a social worker

1

employed by the Cuyahoga County Department of Children and Family Services ("CCDCFS"), was the primary case worker for Pittman's son Najee, who was removed from his mother's custody by CCDCFS. After Najee was adjudicated neglected by the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court"), the court granted legal custody of him to Martha and Emmitt Graves, his maternal great aunt and uncle. Pittman, who maintains that he wished to take custody of Najee, asserts that Hurry misrepresented his desire and ability to parent Najee to CCDCFS and the juvenile court. He also alleges that Hurry impeded his ability to participate in the custody proceedings. As a result, he claims that his fundamental right to maintain a parent-child relationship with Najee was compromised in violation of the Fourteenth Amendment guarantee of substantive and procedural due process. Hurry argues that she is absolutely immune from suit for her participation in juvenile court proceedings, and that the doctrine of qualified immunity bars the remainder of Pittman's claims against her. Because we find that Hurry is immune from Pittman's claims, we **REVERSE** the district court's order denying her summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Najee Waters, born on September 7, 2000, is the son of Pittman and Latarra Waters.[1] On January 2, 2001, an emergency situation required CCDCFS to assume custody of Najee and B.W., Najee's maternal half-sister, both of whom had been in the care of Latarra, a known drug addict. The following day, January 3, 2001, CCDCFS filed a complaint in the juvenile court, alleging that Najee and B.W. were neglected and requesting that CCDCFS be granted temporary custody of the children. The complaint erroneously stated that Pittman had not established paternity of Najee and was not involved in Najee's care or support, when in fact Pittman claims to have established paternity on January 2, 2001; the complaint was later corrected on the record to reflect that "[a]lleged father of Najee, Ricky Pitman [sic], has established paternity and provides

---

[1]Both the parties and the district court identify Najee's mother as Latarra Waters, but some of the Ohio court documents refer to her as Latarra Palmer. Because of this discrepancy, we refer to Najee's mother as "Latarra" throughout.

financial support for the child and was unable to visit with the child on a consistent basis due to interference from mother." On January 5, 2001, Pittman attended a hearing on the complaint, and the juvenile court appointed him counsel, at his request, after he executed an affidavit of indigency. Both Najee and B.W. were returned to Latarra's custody after the hearing.

In early June 2001, CCDCFS again was required to take Najee and B.W. into emergency custody. This time, a magistrate granted CCDCFS's motion for emergency temporary custody of the children during a hearing on June 12, 2001. Pittman attended the hearing, at which the magistrate renewed his counsel's appointment. On August 3, 2001, Hurry filed a case plan with the juvenile court, which reflected that the children had been placed in a foster family home. The case plan also contained an action plan that the family needed to implement in order to terminate CCDCFS's temporary custody. As part of this action plan, Pittman was required to submit to a psychological examination, take parenting classes, and undergo family preservation services.

At or around the time CCDCFS assumed custody of Najee and B.W., Hurry began investigating Pittman's household for the potential placement of Najee while the children remained in CCDCFS custody. She visited Pittman and his family at their home at 3207 Central Avenue in Cleveland, Ohio, though during the visit Pittman informed her they were planning to move. Additionally, Hurry had Pittman and his wife, Bonita Pittman, complete a Release of Information form used by CCDCFS as part of its caregiver approval process. Hurry later used the releases to confirm that neither of the Pittmans had a criminal record, as required by CCDCFS procedure.

Before Hurry could further pursue Pittman's approval process, she maintains that, "within the first ninety days of the [June 12, 2001] removal, Mr. Pittman became very uncooperative." She claims that Pittman refused to provide her with his new address or financial records, expressed unwillingness to allow Latarra to have any contact with Najee should Najee be placed with him, and would not agree to assume care of B.W. despite CCDCFS's policy that siblings be placed together whenever possible.

Pittman does not deny that he did not want to take charge of B.W., though he disputes Hurry's remaining allegations. Specifically, Pittman asserts that he "never failed to cooperate with Cynthia Hurry or anyone else at [CCDCFS]," he "never refused to give Cynthia Hurry [his] address," he "never told Cynthia Hurry or anyone at [CCDCFS] that if [he] got custody of Najee that [he] didn't want LaTarra [sic] to be a part of his life," and he "never refused to give Cynthia Hurry or anyone at [CCDCFS] financial information." Nevertheless, Hurry "never completed or finished" Pittman's approval process, alleging Pittman "would not have been approved" for placement due to his "uncooperativeness" and failure to facilitate a CCDCFS inspection of his new home. Hurry also asserts that she verbally notified Pittman his approval process had come to a stop in the late summer or fall of 2001, though Pittman claims "[he] was never told that [he] was out of consideration."

On November 16, 2001, at a hearing attended by Pittman and his counsel, a magistrate adjudicated Najee and B.W. neglected. The magistrate found that "[Latarra]'s whereabouts are unknown. She has no stable housing nor has produced any proof of income. She was referred for a psychological evaluation, but has not complied." The magistrate further ruled that CCDCFS should retain custody of the children until their dispositional hearing. The juvenile court approved the magistrate's decision on December 5, 2001.

The magistrate held Najee and B.W.'s dispositional hearing on January 18, 2002. Pittman claims that he attended the hearing, though the juvenile court records are unclear on this point.[2] The magistrate granted temporary custody of the children to CCDCFS, which order the juvenile court adopted on February 4, 2002. The magistrate's decision notes that "[f]ather Ricky Pittman did not show he was interested in receiving custody of his child Najee." After the hearing, CCDCFS transferred the children from foster care into the care of their maternal great aunt, Martha Graves, and her husband, Emmitt Graves.

---

[2]While the juvenile court records note "mother nor fathers present," they also state that "all necessary parties were present this day in court" and "father Ricky Pittman has counsel."

CCDCFS filed a motion for permanent custody of Najee and B.W. with the juvenile court on February 22, 2002. As part of the motion, Hurry submitted an affidavit containing the following statements: "Najee's relationship with his father has been adversely affected by father's failure to visit or communicate with his child for a time period of greater than 90 days"; "[f]ather of Najee has expressed his intent to agree with permanent custody to CCDCFS"; "[p]arents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home"; and "[p]arents have failed to substantially comply with their court ordered case plan." Furthermore, Hurry admits that CCDCFS never considered Pittman for custody of Najee.

Pittman contests Hurry's representations to the juvenile court and the basis for her decision to discount him as a potential custodian of Najee, again disputing the notion that he was uncooperative with Hurry and CCDCFS. He also alleges that "[he] never told anyone at [CCDCFS] that [he] agreed with a grant of Permanent Custody, . . . [he] never agreed to allow [his] parental rights to be severed," and "[he] visited Najee when [Najee] was made available to [him]." Furthermore, he challenges Hurry's assertion that his failure to comply with the case plan was a driving force in her decision not to recommend him for custody. Though Pittman does not dispute that he failed to complete the case plan's objectives, he offers evidence that Hurry did not receive notice of his failure to attend the required parenting classes until after she filed the affidavit in support of permanent custody; he also points to Hurry's assessment that CCDCFS policy usually allows parents at least twelve months to complete their case plan before CCDCFS seeks permanent custody. Finally, Pittman alleges that Hurry indicated to him that he was "next in line" for custody of Najee in the event that CCDCFS's plan for reunification with Latarra proved unworkable.

On June 10, 2002, Najee and B.W.'s case was reassigned to a social worker from Beechbrook, a private agency, making Hurry no longer the primary case worker in the matter. CCDCFS held a Semi-Annual Administrative Review ("SAR") of the case on June 13, 2002; present were Latarra, the Graveses, the Beechbrook case worker, another CCDCFS social worker, and a CCDCFS facilitator. The SAR report prepared by the

facilitator indicated that "Mr. Pittman does not want to be involvement [sic]," Pittman and his wife had attended some parenting classes but had dropped out, and "[n]either father has any contact or involvement with the children at this time." As a result of the SAR, on June 19, 2002, CCDCFS filed a motion with the juvenile court seeking to withdraw the motion for permanent custody and requesting instead that Martha Graves be granted legal custody of Najee and B.W.

After several unsuccessful attempts to serve Pittman at his Central Avenue address with CCDCFS motions and notices of hearings, on June 25, 2002, Hurry filed an affidavit for notice by publication with the juvenile court. In the affidavit, Hurry stated that she had "made reasonably diligent efforts to locate" Pittman, including "[a]sking father for his new address [which] he refused to provide [and he] stated he wants nothing to do with the child." However, Pittman claims that "[a]t all times[] Cynthia Hurry knew my address and/or phone number or how to obtain it," including checking with Latarra, inquiring through various Cuyahoga County agencies, or cross-referencing his child support payments. Further, he alleges that he never knew that CCDCFS had applied for permanent custody or that "the Graveses were being considered for adoption," even though he asked to be kept "in the loop" and "abreast of everything that was going on" in the custody proceedings. On the other hand, Pittman admits that he did not try to contact his court-appointed attorney after the dispositional hearing on January 18, 2002, nor did he file a change of address with the juvenile court after moving from his Central Avenue address.

On August 21, 2002, the juvenile court convened a hearing on CCDCFS's pending motions, but it was continued based on the court's finding that "notice requirements have not been met and that all necessary parties were not present this day in court." Conspicuously absent was Pittman and his attorney; the juvenile court noted that "[e]fforts to serve Ricky Pittman were unsuccessful. CCDCFS reports that it will serve Mr. Pittman by publication." The hearing reconvened on October 30, 2002. Neither Pittman nor his attorney were present, but the juvenile court nonetheless found that "Pittman has been served by publication" and "[s]ervice has been perfected on all

the parties." The juvenile court proceeded to grant legal custody of Najee and B.W. to Martha and Emmitt Graves. The magistrate decided to terminate CCDCFS's protective supervision over the case at a hearing on January 28, 2003; this decision was adopted by the juvenile court on February 10, 2003.

Latarra died on November 2, 2003. After learning of her death, Pittman sought custody of Najee by filing a motion for modification of custody with the juvenile court on February 18, 2004. Pittman claims that "[he] had always been ready, willing and able to parent Najee, but . . . [he] reasonably relied on the representations of [CCDCFS] that their first effort would be to reunite Najee with his mother and that if that failed, [he] would be next in line." Therefore, according to Pittman, he "relied on [CCDCFS] to contact [him]" regarding "a serious legal matter of . . . awarding the child to a great aunt," and "[h]ad [he] realized earlier that [CCDCFS] had intentionally cut [him] out of the process, [he] would have made more of an effort to pursue custody." On October 6, 2004, the juvenile court found that it lacked subject-matter jurisdiction to consider the motion, as more than one year had elapsed since the conclusion of the custody proceedings and the Graveses had since moved with the children to Indiana. The Ohio Court of Appeals affirmed.

On February 9, 2005, Pittman filed the instant action against CCDCFS and Hurry in the United States District Court for the Northern District of Ohio. Pittman seeks damages and a declaratory judgment under 42 U.S.C. § 1983, claiming that Defendants unconstitutionally deprived him of his fundamental right to family integrity, failed to accord him requisite due process before awarding custody of Najee to Martha Graves, and acted wantonly and recklessly in the state court custody proceedings. The district court initially granted Defendants' motion to dismiss Pittman's claims under the *Rooker-Feldman* doctrine, *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, No. 05-00541, 2006 WL 42341 (N.D. Ohio Jan. 6, 2006), but this court reinstated all claims on appeal, *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 241 F. App'x 285 (6th Cir. 2007). Defendants moved for summary judgment on October 15, 2008, arguing that Pittman's claims are barred by the statute of limitations, Pittman cannot

establish a violation of his Fourteenth Amendment rights, CCDCFS is not responsible for any constitutional injury to Pittman, and Hurry is immune from suit. The district court granted summary judgment to CCDCFS, but denied summary judgment to Hurry on all of Pittman's claims. *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, No. 05-00541, 2009 WL 2567776 (N.D. Ohio Aug. 17, 2009). Hurry filed a timely interlocutory appeal of the district court's decision that she was not entitled to immunity.

## JURISDICTION AND STANDARD OF REVIEW

This case comes to us on a denial of summary judgment, a posture which is not normally appealable to this Court. However, orders denying absolute or qualified immunity may be immediately appealed as final decisions within the meaning of 28 U.S.C. § 1291, *Will v. Hallock*, 546 U.S. 345, 350 (2006) (citing *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) and *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)), "to the extent they present issues of law separable from the merits yet potentially determinative of a claim," *Skousen v. Brighton High Sch.*, 305 F.3d 520, 525 (6th Cir. 2002) (citing *Mitchell*, 472 U.S. at 526-28 and *Mattox v. City of Forest Park*, 183 F.3d 515, 518-19 (6th Cir. 1999)). Pittman argues that this Court lacks jurisdiction over this appeal because the district court denied Hurry's claim of immunity based on factual disputes.

While a defendant raising an immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial," *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995), this Court may entertain the questions of law raised in such an appeal "'regardless of the district court's reasons for denying qualified immunity,'" *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 402 (6th Cir. 2007) (quoting *Williams v. Mehra*, 186 F.3d 685, 689-90 (6th Cir. 1999) (en banc)). To this end, "a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002) (citing *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999)). Though

Hurry "disputes [Pittman]'s version of the story," she has nonetheless limited her arguments before this Court to whether, as a matter of law, she is entitled to absolute or qualified immunity based on "the evidence viewed in the light most favorable to [Pittman]." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)).  Therefore, we may review the district court's denial of summary judgment based on Hurry's claims of immunity.

"We review the district court's denial of summary judgment *de novo*, using the same Rule 56(c) standard as the district court." *Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1504 (2010).  Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  In considering a motion for summary judgment, "the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "That [Hurry's] motion[] for summary judgment w[as] based on claims of absolute and qualified immunity does not affect the standard of review that applies.  Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*." *Moldowan*, 578 F.3d at 374 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 737, 742 (6th Cir. 2006)).

**ANALYSIS**

Pittman claims that Hurry violated his right to substantive and procedural due process under the Fourteenth Amendment. Specifically, he argues that Hurry unconstitutionally deprived him of his fundamental liberty interest in maintaining a parental relationship with Najee by "regularly, repeatedly and on an ongoing basis misrepresenting his status, his whereabouts and his attitude toward parenting Najee in . . . filings to the Juvenile Court"[3]; by misrepresenting his "status [and] his attitude toward parenting" when "participating in agency decisions" regarding the placement and custody of Najee; and by "completely cut[ting] him out of the [placement and custody] process." On this last point, Pittman objects to Hurry's handling of his caregiver approval process, in particular her alleged failure to inform him that she had halted his consideration. Additionally, Pittman alleges that he was precluded from participating in the juvenile court proceedings due to his reliance on Hurry's misrepresentation to him that, as Najee's "natural father," he would be the "next choice to care for Najee" if and when CCDCFS determined Latarra an unfit parent. He also claims that Hurry should have personally informed him of the status and schedule of the juvenile court proceedings once it became clear that he was not receiving the court notices sent to his Central Avenue address. The district court concluded that Hurry was not entitled to absolute or qualified immunity with respect to any of these actions. We disagree, and decide that Hurry is immune from all of Pittman's claims.

---

[3]In his complaint, Pittman also claims injury from misrepresentations in "internal government documents." The only CCDCFS document in the record containing statements that Pittman disputes is the SAR report prepared in June 2002, after Hurry was no longer the primary social worker on Najee and B.W.'s case. The SAR report was prepared by CCDCFS facilitator Richard Grace and reflects decisions made in a meeting that Hurry did not attend. Because Hurry appears to have had no part in the preparation of the SAR report and Pittman does not argue that she was responsible for any of the statements therein, any alleged harm resulting from the report is not germane to Pittman's claims against Hurry.

## I.      Absolute Immunity

Hurry first argues that she is entitled to absolute immunity with respect to her allegedly erroneous statements to the juvenile court regarding Pittman. These alleged misrepresentations are contained in three filings: the original complaint[4] filed with the juvenile court on January 3, 2001; Hurry's sworn affidavit supporting CCDCFS's motion for permanent custody; and her sworn affidavit requesting that the juvenile court serve Pittman by publication.

"[U]nder certain circumstances, social workers are entitled to absolute immunity." *Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000) (en banc). The scope of this immunity is akin to the scope of absolute prosecutorial immunity, *id.*, which applies to conduct "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). As this Court previously has described:

> The analytical key to prosecutorial immunity . . . is *advocacy*—whether the actions in question are those of an advocate. *See Buckley* [*v. Fitzsimmons*], 509 U.S. [259,] 273-74 [(1993)]; *Kalina* [*v. Fletcher*], 522 U.S. [118,] 125 [(1997)]; *Pusey* [*v. City of Youngstown*], 11 F.3d [652,] 658 [(6th Cir. 1993)]. By analogy, social workers are absolutely immune only when they are acting in their capacity as *legal advocates*—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions. The case before us turns on whether the actions of which [the plaintiff] complains were taken by [the defendant social worker] *in her capacity as a legal advocate*.

*Holloway*, 220 F.3d at 775.

Hurry filed both the complaint and the affidavit in support of the motion for permanent custody in her capacity as a legal advocate, and she is therefore entitled to absolute immunity with regard to these actions. "[F]amily service workers [are]

---

[4]The complaint identifies Terrance Evans—Hurry's supervisor—as the complainant. Nevertheless, Pittman alleges that Hurry actually prepared and/or filed the complaint. Viewing the evidence in the light most favorable to Pittman, we assume that Hurry was responsible for the misrepresentations in the complaint.

absolutely immune from liability in filing [a] juvenile abuse petition, due to their quasi-prosecutorial function in the initiation of child abuse proceedings." *Salyer v. Patrick*, 874 F.2d 374, 378 (6th Cir. 1989). The filing of the affidavit—which reflects Hurry's opinion "[t]hat permanent custody is in the best interest of [Najee and B.W.]"—represents precisely the sort of conduct within a social worker's absolute immunity "for her testimony or recommendations given in court concerning the child's best interests as she saw the matter." *Holloway*, 220 F.3d at 776. Both of these actions are essential to Hurry's ability to "protect the health and well-being of the children," and this Court has recognized the need to allow her "to perform the necessary tasks to achieve this goal without the worry of intimidation and harassment from dissatisfied parents." *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984).

Hurry's submission of the affidavit for publication was conduct intimately associated with the judicial process and also qualifies for absolute immunity. Ensuring adequate service of process in juvenile court proceedings is a judicial function committed to the juvenile court under Ohio law. *See* Ohio R. Juv. P. 15(A) ("After the complaint has been filed, the court shall cause the issuance of a summons directed to the child, the parents, guardian, custodian, and any other persons who appear to the court to be proper or necessary parties."); Ohio Rev. Code Ann. § 2151.29 (setting procedures for the service of summons, which allow the clerk of the juvenile court to undertake notice by publication "[w]henever it appears by affidavit that after reasonable effort the person to be served . . . cannot be found or the person's post-office address ascertained"). Hurry's affidavit for publication contained sworn testimony relevant to the juvenile court's duty to execute proper service of process, and this Court has specifically stated that "testifying under oath" is conduct within social workers' "capacity as legal advocates." *Holloway*, 220 F.3d at 775 (emphasis omitted); *cf. Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1373 (8th Cir. 1996) ("To the extent [defendant child welfare authorities] are sued because [defendant social worker] made arguably false statements in her affidavit in her role as a witness before the state court, the doctrine of absolute witness immunity applies.").

Whether Hurry made intentional misrepresentations to the juvenile court in the complaint and affidavits does not affect the conclusion that she is entitled to absolute immunity. The district court reasoned that "ma[king] misrepresentations . . . to the juvenile court . . . is conduct that would not constitute advocacy." *Pittman*, 2009 WL 2567776, at *8. However, this conclusion is at odds with the functional approach towards prosecutorial immunity adopted by both the Supreme Court and this Court, and therefore it is at odds with the absolute immunity accorded to social workers. As this Court has recognized, prosecutorial immunity applies "so long as the general nature of the action in question is part of the normal duties of a prosecutor," even when that immunity "bar[s] § 1983 suits arising out of even unquestionably illegal or improper conduct by the prosecutor." *Cady v. Arenac Cnty.*, 574 F.3d 334, 340 (6th Cir. 2009). Pursuant to this rule, prosecutors do not forfeit their absolute immunity when they knowingly make false statements while advocating before the court: "Like witnesses, prosecutors and other lawyers were absolutely immune from damages liability at common law for making false or defamatory statements in judicial proceedings (at least so long as the statements were related to the proceeding), and also for eliciting false and defamatory testimony from witnesses." *Burns v. Reed*, 500 U.S. 478, 489-90 (1991). Because absolute immunity for social workers is akin to absolute immunity for prosecutors, the same protection must apply here, no matter how undesirable the results. In the words of Chief Judge Learned Hand, absolute immunity represents "a balance between . . . evils"; "[I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *quoted in Imbler*, 424 U.S. at 428.

Neither can Pittman circumvent Hurry's absolute immunity for filing the complaint and affidavits by stating a claim based on "her underlying action in failing to properly investigate [him], which led her to put false information" in those documents. While conduct pursuant to a social worker's investigatory functions are not entitled to absolute immunity, *see Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989)

(denying absolute immunity to a social worker's decision to initiate and continue an investigation of possible child abuse), this Court rejected a similar failure-to-investigate claim in *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416 (6th Cir. 2001). In that case, this Court extended absolute immunity to two social workers who "failed to conduct a careful investigation before incorporating . . . false accusations in [a child abuse] petition." *Id.* at 421. This Court also determined that defendant social workers were absolutely immune from plaintiffs' allegation that they could have facilitated the return home of plaintiffs' child "had [they] performed an adequate investigation at any time after [the child's removal from plaintiffs' home by the juvenile court]." *Id.* at 422. After noting that "Tennessee law entrusts the decision whether to return a neglected child to the home from which he was removed to the Juvenile Court," this Court held that a social worker's "function of making . . . recommendations" on such matters to the juvenile court, "*including the underlying investigation*, is . . . intimately related to the judicial phase of child custody proceedings" and therefore protected by absolute immunity. *Id.* at 422-23 (emphasis added). Like the state law at issue in *Rippy*, Ohio law charges the juvenile court with making custody determinations, *see* Ohio Rev. Code Ann. §§ 2151.353(A)(3), 2151.414(A)(1), and executing service of process, *see* Ohio R. Juv. P. 15(A); Ohio Rev. Code Ann. § 2151.29. Thus, Hurry's absolute immunity also protects her from Pittman's claim that her allegedly false assertions in the complaint and affidavits stem from an inadequate investigation. For these reasons, the district court erred by determining that Hurry was not absolutely immune from Pittman's claims based on the complaint and two affidavits she submitted to the juvenile court.

## II.     Qualified Immunity

Of course, Hurry's absolute immunity does not extend to conduct unrelated to her role as an advocate before the juvenile court. This includes her alleged misrepresentation of Pittman's "status [and] his attitude toward parenting" Najee while participating in "agency decisions" concerning Najee, as well as Pittman's assertion that Hurry "cut him out of the [placement and custody] process" by improperly investigating him as a potential caregiver, misrepresenting to him that he was "next in line" for

custody, and failing to keep him abreast of the developments in the juvenile court proceedings. Hurry asserts that she is entitled to qualified immunity for these actions.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether a government official is entitled to qualified immunity involves two inquiries: "first, we must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to [him], show that the defendant-official's conduct violated a constitutionally protected right; [second,] we must . . . determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009)). The order in which we address the two prongs of the qualified immunity analysis is left to our discretion. *Pearson*, 129 S. Ct. at 818. Our inquiry begins, and ends, with an analysis of whether Hurry's actions violated a constitutionally protected right—namely, Pittman's substantive and procedural due process rights.

Pittman premises both his substantive and procedural due process claims on an alleged deprivation of his "fundamental liberty interest in family integrity." *See Prater v. City of Burnside, Ky.*, 289 F.3d 417, 431 (6th Cir. 2002) ("To establish either a substantive or procedural due process violation, [plaintiff] must first show that the [government official] deprived it of a constitutionally protected liberty or property interest."). We assume for the purposes of our discussion that Pittman has a fundamental liberty interest in maintaining his parent-child relationship with Najee. *See Lehr v. Robertson*, 463 U.S. 248, 261 (1983) ("When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the due process clause." (quoting *Caban v. Mohammed*, 441

U.S. 380, 392 (1979))); *see also Caban*, 441 U.S. at 397 (Stewart, J., dissenting); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972). *But see Michael H. v. Gerald D.*, 491 U.S. 110, 123-30 (1988) (plurality opinion) (concluding that biological father who had an established relationship with his child did not have liberty interest sufficient to invalidate state statutory presumption that the mother's husband was the child's father). We also assume Pittman has alleged a deprivation of this right that would trigger the substantive and procedural protections of the Due Process Clause—namely, the failure to award him placement or custody of Najee, or "to even consider" him for placement or custody.[5] Nevertheless, because Hurry's conduct neither caused that deprivation nor interfered with the process due upon that deprivation, Pittman cannot show that she violated his constitutional rights. She therefore is entitled to qualified immunity.

### A.       Substantive Due Process

"Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996) (internal quotation marks omitted). "Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir.

---

[5]This is hardly a foregone conclusion. The deprivation Pittman alleges is not one that has traditionally been designated by the courts as a deprivation of parental rights. As the district court failed to recognize, this is not a case where Hurry or CCDCFS removed Najee from Pittman's custody. *See Pittman*, 2009 WL 2567776, at *8 (denying Hurry qualified immunity based on *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 827-28 (W.D. Mich. 2004), a removal case). At no point in Najee's life has Pittman acquired physical custody, or any form of legal custody, of Najee. *Cf. Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006) (holding that "non-custodial parents with court-ordered visitation rights have a liberty interest in the companionship, care, custody, and management of their children" that is "unambiguously lesser in magnitude than that of a parent with full legal custody"). This also is not a situation in which the state terminated the parent-child relationship, an action that "'must be accomplished by procedures meeting the requisites of the Due Process Clause.'" *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 37 (1981) (Blackmun, J., dissenting)). Pittman's parental rights survived the award of legal custody of Najee to the Graveses; under Ohio law, a grant of legal custody to a non-parent leaves intact parents' "residual parental rights, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility of support." Ohio Rev. Code Ann. § 2151.353(A)(3)(c). Overall, Pittman remains a non-custodial parent capable of seeking visitation rights or even custody of Najee from the Indiana courts. *See* Ind. Code §§ 31-14-10-1, 31-34-23-1.

1997) (citing *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993) and *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1474 (6th Cir. 1993)). Pittman premises his substantive due process claim on the deprivation of his fundamental liberty interest in parenting Najee, so his claim is of the first type.[6] In this regard, "substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." *Bartell v. Lohiser*, 215 F.3d 550, 557-58 (6th Cir. 2000) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

Hurry cannot be liable for violating Pittman's substantive due process rights because, to the extent that Pittman suffered a deprivation of his fundamental right to family integrity, that deprivation was perpetrated by the juvenile court, not by Hurry. Pittman alleges that, due in large part to her mishandling of Pittman's caregiver approval process, Hurry made detrimental misrepresentations about Pittman in internal CCDCFS proceedings concerning Najee. As a result, Pittman asserts, CCDCFS determined that he was unfit for placement or custody of Najee. However, even if Hurry's actions led CCDCFS to conclude that he was an unfit caregiver, this did not result in the failure to award or "to even consider" Pittman for placement or custody. Under Ohio law, the juvenile court decides whether to grant permanent custody to CCDCFS or to grant legal

---

[6]The district court improperly analyzed Pittman's substantive due process claim under the "shock the conscience" standard. *See Pittman*, 2009 WL 2567776, at *5-*6. In the past, this Court has used both the "shock the conscience" rubric and the deprivation of fundamental rights theory to assess substantive due process claims against social workers. *Compare Bartell v. Lohiser*, 215 F.3d 550, 557-59 (6th Cir. 2000) (applying strict scrutiny to mother's substantive due process claim based on state child services workers' role in terminating her custody of her son), *with Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635-36 (6th Cir. 2007) (stating that father had to allege "'conduct intended to injure in some way unjustifiable by any government interest' and that is 'conscience-shocking' in nature" to state a substantive due process claim based on the removal of his daughters from his custody (quoting *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir. 2007))), *and Smith v. Williams-Ash*, 173 F. App'x 363, 365, 367 (6th Cir. 2005) (applying the "shock the conscience" standard to plaintiffs' claims that a social worker violated their substantive due process rights by "thwarting [the plaintiffs'] attempts to recover the[ir] children" after removal and "not providing a probable cause hearing to determine the children's placement"). Nonetheless, Pittman clearly claims a substantive due process violation based on the alleged deprivation of his fundamental liberty interest in family integrity, not on allegedly conscience-shocking conduct. *See* Appellee's Br. 30-31 ("Where the plaintiff does not allege violation of a specific protected liberty or property interest, the test is whether the conduct 'shocks the consience[]'; but where the plaintiff, as here, alleges a violation of a recognized liberty interest, in this case family integrity, the Court applies a different substantive due process test, which requires a compelling government interest and narrowly tailored conduct."); *accord* Pl.'s Resp. Mot. Summ. J. 16, ECF No. 32.

custody to a relative. *See* Ohio Rev. Code Ann. §§ 2151.353(A)(3), 2151.414(A)(1). Similarly, though a CCDCFS caseworker makes an initial determination as to the appropriate placement for a child in CCDCFS custody, that determination is not binding on interested parties, including the parents, until the juvenile court approves and journalizes the child's case plan; if a parent disagrees with the CCDCFS case plan, his recourse is with the juvenile court, which will hear "evidence on the contents of the case plan" and, "based upon [that] evidence . . . and the best interest of the child, shall determine the contents of the case plan." *Id.* § 2151.412(D). In contrast, CCDCFS, like Pittman, is merely a party to the juvenile court proceedings, tasked with presenting to the juvenile court its recommendation as to the appropriate course of action in a particular case. Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive Pittman of his fundamental right. Therefore, Hurry's conduct did not violate Pittman's substantive due process rights, and she has qualified immunity against that claim.

### B.     Procedural Due Process

"[P]rocedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976)). To establish a violation of his procedural due process rights, Pittman must show "(1) that [he] was deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006) (citing *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)). "[D]ue process requires that when a State seeks to terminate [a protected] interest . . . , it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." *Bell v. Burson*, 402 U.S. 535, 542 (1971) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

As discussed above, Hurry is not responsible for depriving Pittman of his protected liberty interest in family integrity.  Nevertheless, Pittman argues that Hurry's conduct denied him the requisite due process of law, that is, notice and opportunity for a hearing, before he was denied placement and custody of Najee by the juvenile court.  With respect to the denial of placement, Pittman alleges that Hurry mishandled his caregiver approval process by improperly discontinuing it without notice to him and based on her false assessment of his uncooperativeness.  But, as previously noted, placement determinations are the province of the juvenile court.  Ohio law allows a parent to contest CCDCFS's placement of a child at the dispositional hearing, Ohio Rev. Code Ann. § 2151.412(D),  and permits any party at any time to "propose a change to a substantive part of the case plan, including . . . the child's placement," *id.* § 2151.412(E)(2).  Therefore, Pittman had an adequate opportunity to challenge Najee's placement, and Hurry's decision to deny Pittman's request for placement and her conduct during the caregiver approval process did not violate Pittman's procedural due process rights.  *See Fitzgerald v. Williamson*, 787 F.2d 403, 408 (8th Cir. 1986) (concluding that parents' procedural due process rights were not violated by defendant social workers' decision to place their child with a foster parent, when state law "provides adequate protection for the parental interests implicated by such decisions [because] parents may petition the juvenile court for modification of custody orders at any time").

With respect to the custody determination, Pittman maintains that Hurry interfered with his right to notice of Najee's custody proceedings.  Specifically, he contends that Hurry deliberately attempted to exclude him from those proceedings by misrepresenting to him that he was "next in line" for custody, thereby discouraging him from keeping tabs on the status of the proceedings.  He also argues that Hurry should have personally ensured that he had received notice of CCDCFS's motions for permanent and legal custody as well as the dates of relevant court hearings.  However, it is the juvenile court's responsibility to ensure that Pittman received adequate notice of the custody proceedings.  *See* Ohio R. Juv. P. 15(A); Ohio Rev. Code Ann. § 2151.29.

Hurry had no independent duty to inform Pittman about developments in the juvenile court proceedings or relevant court dates, and she is not liable for any defects in the juvenile court's notice to Pittman.  Moreover, Pittman was represented by counsel for the duration of Najee's case.  Hurry had no responsibility to advise him about the probable outcome of those proceedings or to recommend to him how best to pursue his interests before the juvenile court.  To the extent that she did so by assuring Pittman he was "next in line" for custody, the fact that Pittman had his own counsel implies that the fairness of the underlying juvenile court proceedings was not compromised.  *Cf. Lassiter*, 452 U.S. at 27 ("If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal.").  Thus, Hurry is not responsible for any deficiencies in Najee's custody proceedings before the juvenile court, and she has not violated Pittman's procedural due process right to those proceedings.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order denying Hurry absolute and qualified immunity, and **REMAND** the case with instructions that the district court grant summary judgment to Hurry on all § 1983 claims.