**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0574n.06

No. 13-6487

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| GARY DALE YOUNG, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | On Appeal from the United States |
| | ) | District Court for the Middle District |
| v. | ) | of Tennessee |
| | ) | |
| PATRICIA VEGA, | ) | |
| | ) | |
| Defendant-Appellee. | | |

_____/

**Before: GUY, KETHLEDGE, and STRANCH, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Plaintiff Gary Young appeals from the entry of summary judgment in favor of defendant Patricia Vega, a caseworker with the Tennessee Department of Children's Services (DCS), in this § 1983 action alleging violation of plaintiff's Fourteenth Amendment due process rights by the court-ordered temporary denial of his liberty interest in the care, custody, and control of his then two-year-old son pending a further hearing. *See* 42 U.S.C. § 1983. The question on appeal is whether the district court erred in finding that Vega was entitled to either absolute or qualified immunity with respect to these claims. To the extent that Young has alleged conduct that falls outside the scope of absolute immunity, the record supports the district court's determination that Vega is nonetheless entitled to summary judgment in her favor. The judgment is affirmed.

**I.**

In the summer of 2010, Gary Young was living with Amanda McKinney and her three children—four-year-old L.M., two-year-old J.M, and one-year-old J.Y.M.—in his trailer located in Fentress County, Tennessee. Young had fathered J.M. and took steps to establish paternity during the summer of 2010. According to Young, he began taking J.M. with him to stay at his mother's trailer in August 2010.[1]

The first of three referrals concerning the possible neglect of McKinney's children was received by the Tennessee Department of Children's Services (DCS) in June 2010, and the matter was assigned to Case Manager Patricia Vega. Vega made several visits to investigate the referrals and had other contacts with McKinney that led DCS to petition to declare all three children dependent and neglected at the end of September 2010.

Specifically, on September 28, DCS filed a 12-page Petition, drafted and signed by Laurie Seber, counsel for DCS, seeking, *inter alia*, temporary and permanent custody, appointment of a guardian ad litem, service on all respondents, and ex parte orders taking emergency temporary custody of the children pending a preliminary hearing. The Petition included a four-page "Statement of Facts," which summarized the case history and facts establishing that the children were "dependent and neglected." Other sections alleged, based on those facts, that the conditions for immediate removal existed and that it would be contrary to the best interest of the children to remain in the custody or control of McKinney and Young. Significantly, Vega signed the Petition both as the representative of DCS and under a separately appended Oath swearing "that the facts stated in the foregoing Petition are true and correct to the best of my knowledge, information, and belief."

---

[1] Vega's case notes reflected that Young was present during her visits to the trailer shared by McKinney and Young on July 20, August 8, and August 27, 2010.

That same day, without a hearing and in express reliance on the sworn Petition, the Fentress County Juvenile Court entered the orders that are the basis of Young's claims. Specifically, the juvenile court ordered the temporary removal of all three children from McKinney and Young, placed all three children in the protective legal custody of the relatives with whom they had stayed the night before, and restrained Young from having contact with any of the children pending a further hearing to be held within three business days. *See* TENN. CODE ANN. §§ 37-1-128(b)(2) and 37-1-152. The oldest child, L.M., was placed in the temporary legal custody of his father, Doug Sells, while both J.M. and J.Y.M. were placed in the temporary legal custody of Young's brother and sister-in-law, Randy and Jacqueline Young. Young seeks damages for the resulting temporary deprivation of his parental rights without a prior hearing with respect to J.M., only.[2]

On September 30, Young appeared with counsel for the scheduled preliminary hearing in juvenile court. The hearing was continued without apparent objection, and was rescheduled for October 28, 2010. The reasons for the continuance are disputed. But, whether the hearing was continued so McKinney could obtain counsel (as plaintiff maintains), or to afford Young's attorney the opportunity to depose Vega (as defendant maintains), Young concedes that the delay was not attributable to Vega. DCS filed an Amended Petition the same day, which was the same as the original except for the addition of facts obtained in interviews with other family members. It too was signed by Vega, both on behalf of DCS and under the same separately appended oath.[3]

---

[2]DCS held an emergency child and family team meeting on September 27, at which McKinney and Young agreed (albeit under pressure) to allow the children to stay with relatives temporarily. Young testified that Vega did not conduct the meeting and did not say anything that he could recall during the meeting. Although Young stated that he would have retrieved J.M. from his brother's care the next day absent the juvenile court's orders, Young makes no claim against Vega with respect to the circumstances of the voluntary removal on September 27.

[3]The requirement that the hearing be held within three days (excluding Saturdays, Sundays, and holidays) may be expressly waived, and any waiver may be revoked at any time. *See* TENN. CODE ANN § 37-1-128(b)(2). Young has disavowed any claim against Vega based on the delay that occurred in conducting the preliminary hearing. *See, e.g.*,

On October 5, after further investigation, DCS stipulated to allowing Young unlimited visitation with J.M. under the supervision of his brother or sister-in-law. That arrangement continued until the hearing. After the preliminary hearing on October 28, the juvenile court found that probable cause had existed for the emergency removal of the children from the home of McKinney and Young and that it would be contrary to the children's best interest to remain in McKinney's custody pending final adjudication. Temporary custody of J.M. was awarded to Young at that time, and permanent custody of J.M. was awarded to Young at the final hearing on May 25, 2011. Young testified not only that J.M. was safer, but also that both he and J.M. were in a better situation than they had been before DCS intervened.

Young filed this § 1983 action alleging that the temporary removal of J.M. without a prior hearing violated his due process rights under the Fourteenth Amendment. Discovery was conducted, and cross-motions for summary judgment were filed. The district court granted defendant's motion and denied plaintiff's motion, finding that the procedural and substantive due process claims were barred by absolute and/or qualified immunity. *See Young v. Vega*, No. 2:11-015, 2013 WL 5592192 (M.D. Tenn. Oct. 10, 2013). Judgment was entered in favor of Vega, and this appeal followed.

**II.**

A district court's decision granting summary judgment is reviewed de novo, as is a decision denying a cross-motion for summary judgment on purely legal grounds. *See McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004). Whether Vega is entitled to absolute or qualified immunity from liability in this § 1983 action is a legal question that we review de novo. *See Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011).

---

*Smith v. Williams-Ash*, 173 F. App'x 363, 365 (6th Cir. 2005) (social worker's alleged thwarting of probable cause hearing to determine temporary placement stated a procedural due process claim).

Tennessee law provides that the juvenile court may order the immediate removal of a child, without a formal hearing, based on a sworn petition or testimony alleging specific facts, when the juvenile court finds there is probable cause to believe that certain conditions exist and that the child is in need of the immediate protection of the court. *See* TENN. CODE ANN § 37-1-128(b)(2). Of the conditions relevant here, Young has not denied that there was probable cause to believe that the children (including J.M.) were dependent and neglected, but disputes only whether there was probable cause to believe that there was "an immediate threat to the child's health or safety to the extent that a delay for a hearing would be likely to result in severe or irreparable harm." TENN. CODE ANN. § 37-1-114(a)(2). Since the juvenile court found that there was, Young contends (by analogy to Fourth Amendment claims) that Vega may be liable notwithstanding the judicial determination because the Petition included false statements of fact without which the orders would not have been issued. *See, e.g.*, *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). We turn first to the question of absolute immunity.

## A.      Absolute Immunity

A government official is entitled to absolute immunity from liability under § 1983 for conduct "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see also Adams*, 656 F.3d at 401-02. By analogy, this court has extended the same absolute immunity to social workers, including case workers like Vega, "when they are acting in their capacity as legal advocates—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc) (emphasis omitted). This immunity extends to claims that false statements were the result of a social worker's failure to investigate properly, *see Rippy v. Hattaway*, 270 F.3d 416, 422-23 (6th Cir. 2001), and to the

filing of an affidavit in support of a motion for permanent custody that reflects the social worker's opinion concerning the best interest of the child, *see Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 725 (6th Cir. 2011). When it applies, absolute immunity "'provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly.'" *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013) (citation omitted), *cert. denied*, 134 S. Ct. 2696 (2014).[4]

Absolute immunity does not apply to actions taken in the capacity of a complaining witness. *Kalina v. Fletcher*, 522 U.S. 118, 129-30 (1997) (prosecutor); *Malley v. Briggs*, 475 U.S. 335, 340-45 (1986) (officer). A complaining witness has historically referred to one who "procured an arrest and initiated a criminal prosecution." *Rehburg v. Paulk*, 132 S. Ct. 1497, 1507 (2012). A statement must be sworn to qualify as the act of a complaining witness, *see Adams*, 656 F.3d at 408-09, but not all testimony or sworn statements are actions taken in the role of a complaining witness, *see Rehburg*, 132 S. Ct. at 1507 (grand jury witness is not complaining witness). It is the act of personally vouching for the truth of the facts that provide the evidentiary support for a finding of probable cause that is not protected by absolute immunity. *Kalina*, 522 U.S. at 129-31; *see also Humphrey v. Sapp*, 462 F. App'x 528, 532-33 (6th Cir. 2012); *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008) (en banc) (social worker).

To determine whether absolute immunity applies, the court must precisely identify the wrongful acts alleged and classify them according to their function. *Pittman*, 640 F.3d at 724-25; *Rippy*, 270 F.3d at 421-22. Because the claims are focused on the ex parte orders entered

---

[4]Social workers who remove children from their homes are "acting in a police capacity rather than as legal advocates." *Kovacic*, 724 F.3d at 694. No Fourth Amendment violation was alleged in this case, however.

September 28, it is Vega's conduct in connection with the initial Petition that must be examined.

The district court was certainly correct in concluding that Vega acted in her capacity as a legal

advocate in filing the Petition on behalf of DCS, and making statements, sworn or not, reflecting

her professional judgment and opinion (including statements regarding the immediacy of the

threat of harm to the children and the best interest of the children). As *Kalina* explained,

absolute immunity applies to acts involving the exercise of professional judgment such as "her

determination that the evidence was sufficiently strong to justify a probable cause finding, . . .

her presentation of the information and the motion to the court" and "even the selection of

particular facts to include in the certification to provide the evidentiary support for the finding of

probable cause[.]" *Kalina*, 522 U.S. at 130.

      However, the exercise of professional judgment "could not affect the truth or falsity of

the factual statements themselves." *Id.* Absolute immunity will not bar Young's claims to the

extent he has limited the wrongful acts complained of to Vega's swearing to the truth of the facts

that provided the evidentiary basis for the juvenile court's probable cause determination. *See*

*Humphrey*, 462 F. App'x 532-33; *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997) (when

"official switches from presenting the charging document to vouching personally for the truth of

the contents of the document . . . absolute immunity must give way to a qualified immunity

inquiry").

**B.    Qualified Immunity**

      Qualified immunity protects government officials from liability under § 1983 "insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On

summary judgment, we ask whether the evidence, viewed in the light most favorable to plaintiff,

would permit a reasonable juror to conclude (1) that the conduct violated a statutory or constitutional right and (2) that the right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The court has discretion to decide which question to answer first. *Id.* at 236.

The Due Process Clause of the Fourteenth Amendment guarantees that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." Parents have a fundamental liberty interest in family integrity—including the right to the care, custody and control of their children—that is protected by the substantive and procedural due process guarantees of the Fourteenth Amendment. *See Kottmyer v. Maas*, 436 F.3d 684, 689-90 (6th Cir. 2006); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The parameters of this right have not been articulated, but it is "neither absolute nor unqualified" and it is "limited by an equal[ly] compelling governmental interest in the protection of children." *Kottmyer*, 436 F.3d at 690. Young's constitutionally protected liberty interest in his parental relationship with J.M. was not disputed.

## 1.      Substantive Due Process

Substantive due process claims may be premised either (1) on deprivation of a particular constitutional right, as was alleged here, or (2) on conduct that shocks the conscience. *See Pittman*, 640 F.3d at 728. When it is the former, "'substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose.'" *Id*. at 728-29 (quoting *Bartell v. Lohiser*, 215 F.3d 550, 557-58 (6th Cir. 2000)). The district court found that Young could not prevail on this claim because the substantive deprivation effected by the ex parte orders was perpetrated by the juvenile court and

not by Vega's actions in petitioning for such relief. We agree.

This case cannot be distinguished from *Pittman*, where we explained, in part, that "[b]ecause the juvenile court has the ultimate decision making power with respect to placement and custody, it alone could deprive Pittman of his fundamental right." *Id*. at 729. Pittman had claimed, among other things, that the social worker's misrepresentations about him and mishandling of the caregiver approval process led the juvenile court to award permanent custody to someone else. *Id*. We applied the same reasoning in *Kolley* to find that the parents could not establish a substantive due process claim based on the temporary loss of visitation and custody of their disabled adult daughter. *See Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585-86 (6th Cir. 2013).[5]

Here, setting aside the sufficiency of the process, the only substantive due process violation alleged was the court-ordered immediate removal and taking of temporary legal custody pending a hearing. The effect was to continue the voluntary removal and provide for a hearing to be scheduled within three days. There can be no doubt that Tennessee law vested the juvenile court with the ultimate decision making authority concerning the issuance of such ex parte orders of immediate removal and temporary placement. As in *Pittman* and *Kolley*, Vega's alleged misrepresentations preceded that deprivation and the temporary loss of custody was a deprivation perpetrated by the juvenile court alone. *Id*. at 586.

### 2.        Procedural Due Process

"'[P]rocedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests.'" *Pittman*, 640 F.3d at 729 (citation omitted);

---

[5]The Kolleys alleged deprivation of their parental rights when the defendants, among other things, petitioned for an ex parte order when no emergency existed, testified falsely about the father's actions and statements, and took advantage of their daughter's disability to make allegations against the mother. *Kolley*, 724 F.3d at 585. Without addressing these claims separately, the court explained that each of the allegations pertained to actions taken *before* the probate court's visitation and custody decisions. *Id*. at 586.

*see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (factors to consider). This court has recognized that even the temporary deprivation of physical custody of one's child will generally require notice and a hearing "within a reasonable time." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007); *see also Doe v. Staples*, 706 F.2d 985, 990 (6th Cir. 1983). Also, we recently noted that "exigent circumstances may alter the notice and hearing requirements typically required under the Fourteenth Amendment in child-removal cases." *Kovacic*, 724 F.3d at 695 (citing *Staples*).[6]

Young's claim, as clarified, was that Vega deprived him of his procedural due process right to a pre-deprivation hearing by causing the juvenile court to issue the ex parte orders absent probable cause to believe that an immediate threat to the child's health or safety existed. Specifically, by analogy to Fourth Amendment claims, Young claimed that Vega deprived him of a prior hearing by "making material false statements either knowingly or in reckless disregard for the truth to establish probable cause[.]" *Vakilian*, 335 F.3d at 517; *see also Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).[7]

### a.      Statement of Facts

The alleged misrepresentations are found in the "Statement of Facts" section of the Petition. Briefly, Vega related that the first referral from a medical facility reported that treatment was declined for one of the children. Vega's visit on July 20 found the child recovering, but raised concerns about the living conditions in the trailer shared by McKinney and

---

[6]Because there is no claim that the initial removal on September 27 was involuntary, there was no obligation to provide a pre-deprivation hearing in that regard. *See Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008). A hearing is required only when a child's removal is instituted or sustained over the parent's objections. *Id.*; *see also Teets v. Cuyahoga Cnty.*, 460 F. App'x 498, 503 (6th Cir. 2012).

[7]Young relies on this court's pronouncement that social workers are governed by the Fourth Amendment's warrant requirement (and its exceptions). *See Kovacic*, 724 F.3d at 695; *Andrews v. Hickman Cnty.*, 700 F.3d 845, 859 (6th Cir. 2012) (warrantless entry). In fact, *Kovacic* also distinguished several cases on the grounds that they "concern[ed] Fourteenth Amendment procedural due process claims rather than the Fourth Amendment exigency requirement." 724 F.3d at 699 n.5 (citing cases). We assume without deciding that this theory applies to this procedural due process claim, but find that Young cannot make the necessary showing.

Young. Vega stated that another referral received on August 25 "reported that the mother and the mother's boyfriend, Gary Young, were using drugs around the children" and "that the mother had the appearance of someone on meth." Vega stated that she "made contact with the mother and children," found the house dirty but the children clean, and observed sores on McKinney's face that she said were from a staph infection. Vega stated that McKinney produced a prescription for pain medication, submitted to a drug test, and did not test positive for any other drugs at that time.

Next, Vega stated that she was made aware on September 14 that Young "had gotten hold of [J.M.], and shook him and was refusing to give the child back to [McKinney]." It was also reported that "Young has been hitting [L.M.] who is not his child." Vega related that she spoke to McKinney, who told her that Young had grabbed J.M., took him to his mother's house and refused to return him. McKinney said she "called law enforcement." The next day, Vega met McKinney at a motel where she had taken the children to stay "due to domestic violence in the home." Vega related that McKinney said Young had threatened her and tried to coerce her into relinquishing custody of J.M. to him. McKinney also told Vega that she would not go back to live with Young "because she was scared he would take [J.M.] away from her."

A referral received on September 21 alleged that McKinney was "using drugs" and "was out looking for meth," and that "Young had hit [L.M.] on his buttock area and left a large welt on [his] left butt cheek." Vega was sent a picture of the bruise. Vega was also told that McKinney had returned to the trailer and was back with Young, who had "been threatening her and abusing the children." On September 22, Vega went to L.M.'s school and confirmed (with the help of the school nurse) that L.M. had a 2x2 inch bruise on his left buttock. When Vega asked how he got the bruise, L.M. reported that Young had "whipped him," and said that Young had "whipped

him and [J.M.] with a belt before."

Vega questioned McKinney the same day. McKinney said she did not know about the bruise, but added that if L.M. had one he probably got it while staying with his father. After consulting with others at DCS, Vega advised McKinney that she and the children could not stay with Young. Vega called a domestic violence shelter, handed McKinney the phone, and overheard McKinney say that Young had threatened to kill her if she took J.M. from him. McKinney and the children went to stay at the shelter. But, McKinney left with the children one night, came back the next, and would not say where they had gone. When DCS learned about this, a child and family team meeting was held on September 27. McKinney and Young agreed to allow the children to be placed with family members at that time, and the juvenile proceedings were commenced the following day.[8]

### b.    Analysis

To overcome qualified immunity based on a reasonable reliance on a judicially secured arrest warrant, a plaintiff must (1) make "a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Vakilian*, 335 F.3d at 517 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). It bears noting that there was no claim of actual fabrication or falsification by Vega. Rather, Young alleged that Vega intentionally misrepresented the facts concerning six allegations pertaining to his conduct.

---

[8]As noted, the Amended Petition filed on September 30 included additional information that DCS Attorney Laurie Seber obtained in interviews with family members, including McKinney's mother and Young's brother. Without restating the accounts of those interviews, suffice it to say that there were first-hand reports that McKinney was abusing prescription drugs; that the children were exposed to her drug use and persistently poor living conditions in the trailer; and that McKinney told her mother that Young shook J.M. while taking him from her. In addition, McKinney's mother reported that L.M. was afraid of McKinney and Young; that L.M. told her that McKinney and Young "fight over money and pills"; and that L.M. had told her that the bruise she discovered was from "Gary." Young's brother also stated that he had been called multiple times to take the children during domestic disputes between McKinney and Young.

The first three alleged misrepresentations—that *he* used drugs around the children, that he *shook* J.M. when taking him from McKinney, and that he *hit J.M. with a belt*—were not false and were certainly not material to the probable cause determination. Vega testified that she did not investigate these specific reports; but, as the district court observed, the narrative stated only that the same had been reported to her. Also, the narrative accurately reflected the steps that she did take to investigate the referral about drug use and to corroborate the report that Young had taken J.M. from McKinney (whether or not he was shaken in the process). Young counters that the statements were made false by implication because the Petition stated elsewhere: "Petitioner has investigated the above allegations and determined said allegations are validated and that it is in the best interest of the children and the public to bring these proceedings." The general statement, even if deemed to be sworn, does not serve to make these allegations knowingly or recklessly false statements.

Young argued that two other allegations—that Young threatened McKinney and engaged in domestic violence—were "false" because they had not been "investigated" or "validated." Vega admitted that she did not believe some of the things McKinney told her and did not question Young directly. However, despite use of the term "domestic violence," the narrative did not allege the infliction of physical harm and instead related that McKinney said Young was pressuring her about J.M.'s custody and threatened physical harm if she took J.M. away from him. Vega believed McKinney's statements in that regard, met McKinney at the motel where she took the children when she left the trailer, and heard McKinney tell the shelter that Young had threatened to kill her if she took J.M. from him. Nor did the general statement that the allegations had been investigated and validated render statements in the narrative knowingly or recklessly false.

Finally, Young contends that the omission of information known to Vega undermined L.M.'s statement to her that the bruise was caused by Young. In the Fourth Amendment context, this court has recognized that omissions may be falsehoods, but we require a "strong preliminary showing that the affiant intended to mislead the judge by omitting information from the affidavit." *Hale v. Kart*, 396 F.3d 721, 726-27 (6th Cir. 2005); *see also United States v. Hanna*, 661 F.3d 271, 285 (6th Cir. 2011). Vega conceded that she did not include the information that L.M. had been in the care of his father the weekend before the bruise was discovered, or that L.M.'s father admitted to having hit L.M. on the bottom with a flyswatter. Also, Vega's narrative did not mention that L.M. had first attributed the bruise to a dog bite before telling her that Young had "whipped him." But, it was not until after the ex parte orders were entered that L.M. told another case worker that the bruise was not caused by Young. Given that the narrative included McKinney's statements deflecting blame for the bruise to L.M.'s father and that L.M.'s statement corroborated the report that prompted the investigation, Young falls short of demonstrating a strong preliminary showing that Vega intended to mislead the juvenile court.

Moreover, even if that showing had been made, we cannot conclude that the omissions were critical to the finding that there was probable cause. *Hale*, 396 F.3d at 727. That determination is made by including the omitted information and evaluating whether probable cause would still exist. *Id.*; *Sykes*, 625 F.3d at 305. It is relevant that the question was not whether there was probable cause to believe that a crime had been committed against L.M., but, rather, whether there was probable cause to believe that the children were subject to an immediate threat to health or safety. Here, even when the conflicting information concerning the cause of L.M.'s bruise is included, the Petition provided sufficient grounds to warrant a prudent person in believing that an immediate threat to health or safety existed. In particular, there were

reasonable grounds to believe that Young had hit L.M.; that Young took and withheld J.M. from McKinney; that McKinney took the children to a motel to escape threats concerning the custody of J.M.; and that McKinney, who was suspected of abusing drugs, would not say where she had taken the children overnight when she left the shelter. We cannot conclude that the juvenile court would not have issued the ex parte orders if the omitted information had been included. Accordingly, Young cannot overcome qualified immunity and summary judgment was properly entered in Vega's favor.

**AFFIRMED**.