NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0431n.06

No. 19-6235

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| KESHIA TURNER and ROY CHRISTOPHER TURNER, individually and as next friends of RBT and CT (minor children), | ) ) ) ) | **FILED** Jul 24, 2020 DEBORAH S. HUNT, Clerk |
| Plaintiffs - Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| DEBORAH LOWEN, M.D.; VANDERBILT UNIVERSITY MEDICAL CENTER; CHRISTY DUNCAN; TONYA SCOTT, | ) ) ) ) | |
| Defendants - Appellees. | ) ) | |

BEFORE: GIBBONS, McKEAGUE, and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. This case arises from the removal and years-long separation of two minor children, RBT and CT, from their parents following an erroneous determination of child abuse at Vanderbilt University Medical Center ("VUMC"). After a Tennessee state court returned RBT and CT to their parents' custody, the children filed suit in federal court, naming VUMC, a pediatrician employed by VUMC, and two social workers from the Tennessee Department of Children's Services ("DCS") as defendants. In their complaint, RBT and CT assert claims pursuant to 42 U.S.C. § 1983 for alleged violations of their Fourth Amendment and Fourteenth Amendment rights. The district court, acting on the defendants' motions, dismissed the case. It found that the DCS employees were entitled to absolute immunity

and that the physician was entitled to qualified immunity.  The district court also found that RBT and CT failed to state a claim against VUMC.  We agree and affirm.

I.

On December 11, 2014, Keshia Turner took her three-month-old son, RBT, to the Emergency Department at Cumberland Hospital after she noticed swelling in his left leg.  At the Emergency Department, medical staff examined RBT and took x-rays of his leg and torso.  They then discharged him to his mother and instructed her to follow up with RBT's pediatrician the next day.

On December 12, Mrs. Turner took RBT to his pediatrician's office.  At the office, a nurse practitioner examined RBT and informed Mrs. Turner that RBT had multiple rib fractures.  She instructed Mrs. Turner to take RBT to the Cumberland County Sherriff's Office.  She also provided Mrs. Turner with a note addressed to DCS, asking that RBT be taken to East Tennessee Children's Hospital, where RBT was born.

That same day, Mrs. Turner and her husband, Roy Christopher Turner, took RBT to the Cumberland County Sherriff's Office.   Mr. and Mrs. Turner were interviewed by a DCS caseworker, Ivan Hawn, and two investigators from the Sheriff's Office.  During the interview, Hawn told Mr. and Mrs. Turner to take RBT to VUMC.  When Mrs. Turner protested, explaining that VUMC was two-and-a-half hours away and that the staff at East Tennessee Children's Hospital were familiar with RBT's medical history, Hawn threatened to have RBT removed.  The parents agreed to take RBT to VUMC.

That evening, Mr. and Mrs. Turner traveled with RBT to Nashville, Tennessee where RBT was admitted to VUMC.  Upon his admission, Mr. and Mrs. Turner consented to a full exam of RBT, including several x-rays.  The family remained at VUMC overnight.  The next day, Mr. and

Mrs. Turner met with Deborah Lowen, a pediatrician at VUMC who specializes in diagnosing cases of child abuse.

Lowen is a member of the CARE team at VUMC. The CARE team is a committee of medical and nonmedical professionals that reviews cases of suspected child abuse. Lowen is the CARE team's liaison to DCS. The committee also includes members from DCS and local law enforcement agencies. In advance of RBT's arrival at VUMC, Hawn had directly contacted Lowen and the CARE team to discuss the facts of RBT's case.[1]

Lowen separated RBT's parents and interviewed them individually to determine the cause of RBT's injuries. She did not physically examine RBT. Her consultation note, however, reveals that she reviewed a discharge summary from East Tennessee Children's Hospital. The discharge summary recounts Mrs. Turner's difficult pregnancy and RBT's premature birth. Lowen observed that RBT had a Vitamin D deficiency but determined that it was unlikely to have caused his fractures. She also opined that "premature babies can develop metabolic bone disease" before finding that RBT's x-rays and lab results "reveal[ed] no evidence of that." DE 52, First Am. Compl. ("FAC"), PageID 396.

Lowen ultimately concluded that RBT was a "victim of child physical abuse . . . occurring on more than 1 occasion and affecting multiple different bones." *Id.* She contacted Hawn with her findings and informed him that neither RBT's medical history nor his parents' accounts could explain the thirty-three fractures in his ribs, legs, and shoulder blade. Lowen urged Hawn that RBT needed to "be protected from further harm." *Id.*

---

[1] Lowen and VUMC have other ties to DCS. Lowen, for example, is the medical director for the Our Kids Clinic, a group that investigates allegations of child sexual abuse on behalf of DCS. She also regularly serves as an expert witness for DCS in child abuse cases. And Lowen is under contract to review near fatalities for Tennessee as part of its child death review process. VUMC, likewise, regularly provides medical services to foster children on behalf of DCS, receiving over $10 million for services rendered between August 2011 and June 2015. Neither Lowen nor VUMC treated RBT while operating in these other capacities.

Hawn, upon speaking with Lowen and receiving her report, concluded that RBT met the statutory definition of an abused child. He then filed an *ex parte* petition in the juvenile court seeking an emergency order authorizing DCS to take temporary custody of RBT. The juvenile court granted the petition and faxed its order to VUMC. After receiving the order, VUMC prevented Mr. and Mrs. Turner from leaving with RBT.

On December 15, RBT was discharged from VUMC. DCS placed RBT in the care of his paternal grandfather. A new DCS employee, Christy Duncan, was assigned to manage RBT's custody proceedings, including his care and placement. Duncan granted Mr. and Mrs. Turner limited visitation of RBT. On January 21, 2015, Mr. and Mrs. Turner asked Duncan if DCS would test RBT for "brittle bones." *Id.* at 399. Duncan informed them that DCS would perform no further testing. A month later, on February 25, Duncan "administratively substantiated" that RBT was physically abused by Mrs. Turner. *Id.*

In May 2015, Lowen was deposed as part of the juvenile court's ongoing dependency proceeding. She stated in her deposition that she had "no doubt" that RBT's injuries were caused by child abuse. *Id.* at 403. Lowen again addressed possible alternative interpretations of RBT's lab results and medical history but dismissed them as implausible. At the same time, however, she acknowledged that "normal handling" of a child with "severe metabolic bone disease" could cause fractures. *Id.* at 401.

On September 4, Mrs. Turner gave birth to a second son, CT. Four days later, a DCS employee, Tonya Scott, filed an *ex parte* petition in the juvenile court seeking an emergency order authorizing DCS to take temporary custody of CT. Scott's petition relied on Lowen's diagnosis of RBT in 2014 and her subsequent deposition testimony in 2015. The juvenile court issued the

removal order for CT later that day. DCS placed CT with his paternal grandfather and granted his parents limited visitation.

Shortly after CT was removed, Mr. and Mrs. Turner obtained an expert opinion from John Galaznik, a physician in Alabama. Galaznik concluded that RBT suffered from a "metabolic bone disease" and that his injuries and other skeletal abnormalities were not diagnostic of child abuse. Mr. and Mrs. Turner shared this information with Duncan. She took no action in response to the additional opinion.

In the fall of 2015, Mrs. Turner obtained a second expert opinion from David Ayoub, a radiologist in Illinois. Based in part on x-rays taken at VUMC and the discharge summary from East Tennessee Children's Hospital, Ayoub prepared a report concluding that RBT's factures and other skeletal abnormalities were not diagnostic of child abuse. The report was provided to DCS. Ayoub elaborated on his findings at a deposition in February 2016. Duncan took no action in response to Ayoub's report or deposition.

On August 4, 2017, nearly two years after DCS received the expert opinions of Galaznik and Ayoub, a Tennessee circuit court returned full custody of RBT and CT to their parents. At the final hearing, the judge explained that there are "serious medical conditions that can mimic child abuse" and "exonerated" Mr. and Mrs. Turner of "all allegations of abuse." *Id.* at 409. In total, RBT's custodial separation from his parent lasted nearly three years, and CT's custodial separation lasted just under two years.

RBT and CT filed suit in federal court, naming Lowen, Scott, Duncan, and VUMC as defendants.[2] They asserted claims pursuant to 42 U.S.C. § 1983 for alleged deprivations of their Fourth Amendment and Fourteenth Amendment rights. RBT and CT's claims all rest on the same

---

[2] Mr. and Mrs. Turner also filed suit on their own behalf. Their claims were dismissed by the district court and are not at issue in this appeal.

premise: Lowen, Scott, and Duncan failed to conduct an adequate "investigation" and withheld "exculpatory medical information" from the juvenile court, directly causing RBT and CT to be seized and then retained without probable cause. *Id.* at 416. The district court, acting on the defendants' motions, dismissed the case. It found that Scott and Duncan were entitled to absolute immunity and that Lowen was entitled to qualified immunity. It also found that RBT and CT failed to state a claim against VUMC. RBT and CT timely appealed.

## II.

RBT and CT raise three main issues on appeal. First, they argue that the district court erred in granting absolute immunity to Scott and Duncan for their roles in the removal and dependency process. Second, RBT and CT argue that the district court erred in granting qualified immunity to Lowen based on its finding that RBT and CT's asserted rights were not clearly established at the time of their custody proceedings. Finally, RBT and CT argue that the district court erred in relying on the pleading standard to dismiss their *Monell* claims against VUMC. We address each issue in turn.[3]

## A.

RBT and CT first argue that the district court erred in granting Scott and Duncan absolute immunity. We review a district court's grant of absolute immunity *de novo*. *Moldowan v. City of Warren*, 578 F.3d 351, 373–74 (6th Cir. 2009). "The defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly." *Dean v. Byerley*, 354 F.3d 540, 554 (6th Cir. 2004). Social workers, like prosecutors

---

[3] The district court assumed without deciding that Lowen and VUMC acted under color of state law for the purpose of analyzing RBT and CT's § 1983 claims. To state a claim under § 1983, a plaintiff must demonstrate not only that she was deprived of a federal right, but also that the deprivation occurred "under color of state law." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Carl v. Muskegon County*, 763 F.3d 592, 595 (6th Cir. 2014). Because we find that RBT and CT's claims against Lowen and VUMC face other insurmountable obstacles, we do not decide the thornier issue of whether Lowen and VUMC acted under color of state law.

and probation officers, enjoy absolute immunity when they engage in conduct "intimately associated with the judicial process." *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 725 (6th Cir. 2011). This means that "[s]ocial workers are absolutely immune only when they are acting in their capacity as *legal advocates*." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc). "A social worker acts as a legal advocate when initiating court proceedings, filing child-abuse complaints, and testifying under oath," *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015), but not when "performing administrative, investigative, or other functions," *Holloway*, 220 F.3d at 775.

The scope of immunity enjoyed by social workers is remarkably broad. A social worker, for example, is absolutely immune not only from negligent misrepresentations to the court, *see Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 422–23 (6th Cir. 2001), but also knowing and intentional misrepresentations, *Barber*, 809 F.3d at 844. The same holds true whether the misrepresentation is included as part of a petition for removal, sworn statement, or both.[4] *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 684–85 (6th Cir. 2018) (citing *Barber*, 809 F.3d at 844). And although we have often repeated that the investigative and administrative acts of social workers are not shielded, we have interpreted this rule quite narrowly in practice. A plaintiff, for instance, cannot sue a social worker for her alleged failure to "properly investigate" the facts supporting a petition for removal, even if those facts turn out to be false or incomplete. *Pittman*, 640 F.3d at 726. We have also held that a social worker is immune from claims that she could have facilitated the return of a removed child "had [she] performed an adequate investigation

---

[4] RBT and CT contend that *Young v. Vega*, 574 F. App'x 684 (6th Cir. 2014), held that social workers are "not entitled to [absolute] immunity for personally vouching for facts which [are] false in seeking a finding of probable cause." CA6 R. 21, Appellant Br., at 34. That is true, *see id.* at 688–89, but as *Brent* recognized, *Young* is "unpublished and non-binding, and our later published [decision in *Barber*] overrides *Young*'s holding." 901 F.3d at 684–85. RBT and CT repeatedly and inexplicably refer to *Barber* as an unpublished decision, but it is very much a published decision, and *Brent* expressly recognized its abrogation of *Young*. *Id.*

at *any time*" between issuance of an initial removal order and the ultimate juvenile dependency hearing. *Rippy*, 270 F.3d at 422 (emphasis added).

These principles squarely control the claims against Scott and Duncan. The claims against Scott are based solely on her alleged misrepresentations and omissions in the petition for CT's removal. Specifically, RBT and CT allege that Scott failed to conduct an adequate investigation and "intentionally omitted" exculpatory evidence when preparing the petition. DE 52, FAC, PageID 404. As cases like *Brent* and *Pittman* make clear, however, Scott's representations, as well as her decision to rely solely on Lowen's assessment, were "intimately associated with the judicial process."[5] The claims against Duncan fare no better. RBT and CT allege that, once RBT was removed, Duncan failed to: (1) provide the juvenile court with exculpatory information, or (2) adequately investigate the cause of RBT's injuries. Both failures, they allege, prolonged RBT and CT's separation from their parents. As we explained in *Rippy*, however, social workers act "in an advisory role to the Juvenile Court in recommending [if and when] the child is ready to return home." 270 F.3d at 422. "The function of making such recommendations, including the underlying investigation, is . . . intimately related to the judicial phase of the child custody proceedings." *Id.* at 422–23. RBT and CT thus cannot hold Duncan liable for her investigation or assessment of the facts underlying her custody recommendations to the juvenile court.

B.

RBT and CT next argue that the district court erred in granting qualified immunity to Lowen. We review a district court's grant of qualified immunity *de novo*. *Moldowan*, 578 F.3d

---

[5] RBT and CT correctly note that the social worker in *Brent* was denied absolute immunity for his role in "executing the removal order" in support of which he had submitted the allegedly false statements. 901 F.3d at 685. But as the defendants point out, RBT and CT do not allege that Scott or Duncan participated in executing the removal orders for RBT and CT. In fact, the complaint contains no allegations that Scott or Duncan was present when RBT and CT were taken into DCS custody.

at 373–74.  To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  We have "discretion to decide the order in which to engage these two prongs."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  Here, RBT and CT assert two claims against Lowen: one pursuant to the Fourth Amendment for an unlawful seizure, and one pursuant to the Fourteenth Amendment for a deprivation of the fundamental right to family integrity.[6]

i.

RBT and CT first argue that Lowen violated their clearly established Fourth Amendment right to be free from removal pursuant to an order obtained via knowingly false or incomplete information.  They maintain that Lowen violated this right when she conducted a "negligent investigation" of RBT's injuries and "intentionally withheld" exculpatory information from the juvenile court.  DE 52, FAC, PageID 416–17.  In this way, RBT and CT contend, Lowen caused them to be removed pursuant to court orders that were unsupported by probable cause.

---

[6] RBT and CT allude to an additional theory of Fourth Amendment liability.  This theory mirrors RBT and CT's unlawful removal claim but accounts for the period after execution of the removal orders.  RBT and CT allege that the defendants violated this right by withholding exculpatory evidence from the juvenile court and failing to investigate obvious alternative explanations for the cause of RBT's injuries.  Specifically, RBT and CT contend that, if the defendants had shared this exculpatory evidence with the juvenile court or investigated the alternative theories presented by Mr. and Mrs. Turner, it would have "vitiated [the] probable cause" supporting their removal.  CA6 R. 21, Appellant Br., at 39.  We interpret these allegations as a Fourth Amendment "continued detention" claim. *See Gregory v. City of Louisville*, 444 F.3d 725, 747–50 (6th Cir. 2006).  Although RBT and CT do not expressly limit the claim to Scott and Duncan, Lowen is never alleged to have participated in RBT and CT's custody proceedings beyond the preparation and filing of the initial removal petitions, nor is she alleged to have later received the competing medical opinions that Mr. and Mrs. Turner provided to Scott and Duncan.  And only Duncan is alleged to have "caus[ed] RBT and CT to remain unlawfully restrained and seized."  DE 52, FAC, PageID 413.  Accordingly, even if RBT and CT intended to bring a "continued detention" claim against Lowen, they fail to allege facts plausibly suggesting that Lowen's conduct caused this particular constitutional injury. *See Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 614 (6th Cir. 2018) ("Section 1983 does not permit individuals to sue state actors in the abstract; it requires them to connect alleged constitutional violations of the individuals' rights to state conduct.").

The right asserted by RBT and CT was not clearly established at the time of their initial removals. We have long held that law enforcement officials may not submit false statements in support of an arrest warrant if those statements are material to a finding of probable cause. *Peet v. City of Detroit*, 502 F.3d 557, 570–71 (6th Cir. 2007) (Holschuh, J., concurring). This includes not only "deliberate falsehood[s]" but also statements in "reckless disregard for the truth." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). But we have never applied that rule to a physician who makes false or reckless statements in support of a petition for removal. And, even if we assumed that Lowen was in fact acting as a social worker when she reported her suspicions of abuse, it was not until 2018 that we applied the same right to a social worker. *See Brent*, 901 F.3d at 685. When we did so, moreover, we granted the offending social worker qualified immunity because the right had, up until that point, not been clearly established. *Id.* (citing *Barber*, 809 F.3d at 848 (holding, in 2015, that the right to not be removed based on a social worker's false or reckless statements of material fact was not clearly established)). Accordingly, no matter the capacity in which Lowen acted, RBT and CT's asserted right was not clearly established.

ii.

RBT and CT also argue that Lowen violated their clearly established Fourteenth Amendment right to family integrity. They again contend that Lowen violated this right when she withheld "exculpatory medical information" and engaged in "negligent investigation[s]." DE 52, FAC, PageID 416. These acts and omissions, RBT and CT maintain, interfered with their familial rights by causing their removal. Although RBT and CT do not elaborate on the nature of their right to family integrity, the Supreme Court has recognized a substantive due process right to familial relations. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 760 (1982) ("[A] child and his parents share a vital interest in preventing erroneous termination of their natural relationship.");

*Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *see also Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) ("[T]he Constitution recognizes . . . a substantive fundamental right to raise one's child.").

There are two problems with this claim. First, "where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.'" *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Here, the same allegations that support RBT and CT's Fourth Amendment claim—namely, that Lowen caused them to be removed in the face of exculpatory evidence—also support their Fourteenth Amendment claim. "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of . . . governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham*, 490 U.S. at 395; *see also Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012) ("For child removal claims brought by the child, . . . the [Fourth Amendment] provides an alternative, more specific source of protection than substantive due process.").

Second, RBT and CT's claim fails on the merits. We have repeatedly held that, in states where the juvenile court "has the ultimate decisionmaking power with respect to placement and custody, [the juvenile court] alone" may deprive a child of his "fundamental right" to familial association. *Pittman*, 640 F.3d at 729; *see also Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585–86 (6th Cir 2013) (applying *Pittman* to find that, because the juvenile court retained ultimate decision-making authority over placement and custody of the plaintiff, her due process right could not have been infringed by the social worker); *Barber*, 809 F.3d at 848 (same); *Teets v. Cuyahoga*

*County*, 460 F. App'x 498, 502–03 (6th Cir. 2012) (same). "There can be no doubt that Tennessee law vest[s] the juvenile court with the ultimate decision making authority [sic] concerning . . . orders of immediate removal and temporary placement." *Young*, 574 F. App'x at 690, *abrogated on other grounds by Barber*, 809 F.3d at 844. Accordingly, because it was the juvenile court—not Lowen—that retained ultimate decision-making authority over the custody and placement of RBT and CT, Lowen's conduct "did not violate [RBT and CT's] substantive due process rights," and she is entitled to qualified immunity. *Pittman*, 640 F.3d at 729.

C.

Finally, RBT and CT argue that the district court erred in dismissing their *Monell* claim against VUMC. As an assumed state actor, VUMC may, like a city or county, be liable for a "policy or custom" that was the "moving force" behind a violation of RBT or CT's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). RBT and CT could show an actionable "policy or custom" in three different ways. First, they could allege that a VUMC official with "final policymaking authority" committed or directly ordered the deprivation of their rights. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Second, they could allege that VUMC had a written policy pursuant to which an employee violated their rights. *Id.* at 121. Finally, RBT and CT could allege that, even absent a written policy, an employee violated their rights pursuant to "a widespread practice that . . . is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Id.* at 127 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). Under this third theory, RBT and CT would need to show "a clear and persistent pattern" of constitutional violations—not just "one instance" of unlawful conduct. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

RBT and CT fail to meet this standard. They allege that VUMC had a "policy, practice, and custom of providing overzealous 'medical diagnoses' of child abuse while ignoring other feasible explanations" and that this was the "moving force" behind Lowen's "concealment of exculpatory evidence." DE 52, FAC, PageID 391 (emphasis omitted). There are two problems with this theory. First, RBT and CT fail to identify any additional instances of Lowen or other VUMC employees engaging in the type of conduct alleged here. They thus fall short of plausibly alleging a "clear and persistent pattern" of analogous constitutional violations. Second, RBT and CT fail to plausibly allege that Lowen followed an express VUMC policy or was herself an official with final policymaking authority. They do not, for instance, provide any information about the nature, source, or form of the alleged policy. And aside from the conclusory allegation that Lowen was a "policymaker with final authority," they make no effort to describe the governance structure of VUMC or how Lowen fit into that structure. In short, RBT and CT's allegations are "nothing more than a bare recitation of [the] legal standard[]." *Osberry v. Slusher*, 750 F. App'x 385, 398 (6th Cir. 2018) (quoting *Brown v. Cuyahoga County*, 517 F. App'x 431, 436 (6th Cir. 2013)). They thus fail to state a claim against VUMC.

III.

Based on the foregoing, we affirm.